NOV 8 2024 AM 9:46
FILED - USDC - BPT - CT

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH A CELLULAR DEVICE | Case No. 3:24 mj 998 (SDV) <br><br> **FILED UNDER SEAL** |

**AFFIDAVIT IN SUPPORT OF**
**APPLICATION FOR A SEARCH WARRANT**

I, Andrew Charpentier, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION**

1. I submit this affidavit in support of applications for search warrants pursuant to Federal Rule of Criminal Procedure 41 and Title 18, United States Code, Section 2703(c)(1)(A), for information about the location of a AT&T Wireless cellular telephone assigned telephone number (203) 543-9123, accessed through International Mobile Subscriber Identity ("IMSI") 310150606246907, a pre-paid cellular telephone subscribed to Jermaine LITTLE at 52 Harmony Street, Bridgeport, CT (hereinafter, the "**TARGET TELEPHONE**").

2. AT&T Wireless, the service provider for the **TARGET TELEPHONE**, is a wireless telephone service provider that accepts service of process at 11760 US HWY 1, Suite 300, North Palm Beach, FL 33408. The **TARGET TELEPHONE** is described in Attachment A, and the location information to be seized is described in Attachment B.

3. Because I am seeking the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," see 18 U.S.C. § 3127(3) & (4), the requested warrant is designed to also comply with the Pen Register Act. *See* 18 U.S.C. §§ 3121-3127. The requested warrant therefore includes all the information required to be included in an order pursuant to that

statute. See 18 U.S.C. § 3123(b)(1).

4. I am a Special Agent with the Drug Enforcement Administration ("DEA") and have been so employed since 2022. Upon successful completion of the 16-week DEA Basic Agent Training Academy in Quantico, I was assigned to the Bridgeport High Intensity Drug Trafficking Area Task Force ("Task Force"), which is comprised of personnel from the DEA, Connecticut State Police, Norwalk Police Department, Stamford Police Department, Stratford Police Department, Milford Police Department and the Danbury Police Department. Prior to joining the DEA, I was a Correctional Officer for the Bureau of Prisons for approximately three and a half years.

5. During my time with DEA, I have participated in criminal investigations, including investigations into suspected narcotics trafficking. My participation in the investigations has included coordinating controlled purchases of narcotics; utilization and debriefing of confidential informants; conducting electronic and physical surveillance; analyzing various records pertaining to narcotics trafficking; testifying in Grand Jury; interviewing individuals and discussing with other members of law enforcement the manner in which narcotics traffickers obtain, finance, store, manufacture, transport and distribute controlled substances.

6. Based on the above training and experience, I am familiar with the means, methods, and equipment used by persons involved in the use, possession, transportation, distribution and sale of controlled substances, the motivation of such persons involved in these crimes, and the methods utilized to facilitate narcotics distribution.

7. I have participated fully in this investigation and, as a result of my participation and information received from other law enforcement officers, I am thoroughly familiar with the circumstances of the investigation and the information set forth in this affidavit. The statements

contained in this affidavit are based on: (1) my personal participation in the investigation; (2) information provided to me by members sworn members of the Task Force and other federal agents, and by detectives and officers of area police departments; (3) information provided by witnesses and other sources of information; and (4) my experience and training. Unless otherwise indicated, all conversations and statements described in this affidavit are related in substance and part. Because this affidavit is being submitted for the limited purpose I have not included each and every fact known to me regarding this investigation. I submit, however, that I have provided information necessary to provide probable cause to support the described application.

8. Based on my training and experience, and for all the reasons set forth herein, I submit that probable cause exists to believe that the historical cell site information described in Attachment B will constitute or lead to evidence of offenses involving the distribution of controlled substances, in violation of Title 21, United States Code, Section 841(a)(1), the use of a communication facility in the commission of narcotics trafficking offenses, in violation of Title 21, United States Code, Section 843(b), and conspiracy to commit narcotics trafficking offenses, in violation of Title 21, United States Code, Section 846 (collectively, the "**TARGET OFFENSES**") being committed by Jermaine LITTLE a.k.a. "Chewy" and others, as described in further detail below.

## BACKGROUND ON JERMAINE LITTLE

9. Jermaine LITTLE (DOB xx-xx-1977, known to me) a.k.a. "Chewy" is 47 years old and was born in Bridgeport Connecticut. LITTLE appears to use multiple aliases with same social security number and date of birth to include "Chewy," "Fashawn," and "Jamarr."

10. A criminal history check reveals the following felony convictions in the Superior Court for the State of Connecticut: (1) Sale of Narcotics in violation of Conn. Gen. Stat. § 21a-

277(a)(1)(A) on Jan. 11, 2021; (2) First-Degree Kidnapping in violation of Conn. Gen. Stat § 53a-92 on March 14, 2005; (3) Sale of a Hallucinogen/Narcotic in violation of Conn. Gen. Stat § 21a-277(a) on Dec. 12, 2003; (4) Sale of a Hallucinogen/Narcotic in violation of Conn. Gen. Stat. § 21a-277(a) on Nov. 2, 1999; (5) Weapon in a Motor Vehicle in violation of Conn. Gen. Stat. § 29-38 on Nov. 2, 1999; (6) Sale of a Hallucinogen/Narcotic in violation of Conn. Gen. Stat. § 21a-277(a) May 10, 1999; (7) First Degree Failure to Appear in violation of Conn. Gen. Stat. § 53a-172 on May 10, 1999; (8) First Degree Failure to Appear in violation of Conn. Gen. Stat. § 53a-172 on Nov. 2, 1999; (9) Possession of Narcotics in violation of Conn. Gen. Stat. § 21a-279(a) on May 26, 1998; (10) Second Degree Assault in violation of Conn. Gen. Stat. § 53a-60 on Oct. 4, 1994; and (11) First Degree Attempted Robbery in violation of Conn. Gen. Stat. § 53-a-134(a)(4) and First Degree Robbery (Conspiracy) in violation of Conn. Gen. Stat. § 53a-134(a)(4) on July 26, 1994.

11. In addition, on March 10, 2005, LITTLE was convicted in United States District Court for the District of Connecticut with Possession of a Firearm by a Felon in violation of U.S.C. §§ 922(g)(1) and 924(e) and sentenced to a term of imprisonment of 188 months of imprisonment, followed by three years of supervised release. *See United Stats v. Jermaine Little*, No. 3:04-cr-217 (MRK).

## PROBABLE CAUSE REGARDING USE OF THE TARGET TELEPHONE IN DRUG-RELATED ACTIVITY

12. During September 2024, DEA investigators received information from a DEA St. Louis Confidential Source ("CS-1") that Jermaine LITTLE, a resident of Bridgeport, Connecticut, had flown out to Phoenix, Arizona, to acquire two kilograms of fentanyl and was transporting the kilograms back to Connecticut on a Greyhound bus. CS-1 provided the telephone number 203-

643-9123 (the "**TARGET TELEPHONE**") as a number being utilized by Jermaine LITTLE to conduct his fentanyl trafficking.

13. According to CS-1, LITTLE utilized the **TARGET TELEPHONE** in September 2024, and flew out to Phoenix, Arizona to obtain two-kilogram quantities of fentanyl. CS-1 reported that LITTLE traveled from Connecticut to Arizona via commercial airplane and was traveling back to Connecticut on a Greyhound bus. Specifically, CS-1 stated LITTLE utilizes the **TARGET TELEPHONE** primarily for running his drug trafficking organization. Investigators instructed CS-1 to introduce LITTLE to another Confidential Source ("CS-2") local to Connecticut, who has been working for DEA since approximately 2012. CS-2 is a cooperating with law enforcement in exchange for monetary compensation. Information provided by CS-2 has been corroborated and has led to seizure of drugs and arrest of individuals on drug charges.

14. During the week of October 6, 2024, at the direction of investigators, CS-2 made a series of consensually monitored and recorded WhatsApp text messages to Jermaine LITTLE on the **TARGET TELEPHONE** for the purpose of obtaining a sample of fentanyl. During the same week, investigators directed CS-2 to set up a meet with Jermaine LITTLE for the purpose of obtaining a sample of fentanyl at a pre-determined location. Prior to the meet, investigators met with CS-2 at a pre-determined neutral location. At the neutral location, CS-2 and CS-2's vehicle were searched for contraband with negative results; CS-2 was then equipped with a Kel digital transmitter. Subsequently, investigators initiated surveillance in the vicinity of 1085 North Ave, Bridgeport. Investigators observed a white GMC Yukon Denali in the area and observed LITTLE exit 1077 North Ave, Bridgeport and enter the driver side of the white SUV. Mobile surveillance was maintained on LITTLE in the white SUV until he arrived and parked at the pre-determined meet location. The CS-2 was then surveilled to the pre-determined meet location. At

approximately 4:08 p.m., LITTLE directed CS-2 via **TARGET TELEPHONE** meet at a pre-determined location, investigators observed CS-2 park their vehicle next to LITTLE parked in the white SUV. LITTLE was observed exiting the driver's side of the white SUV and entering into the passenger seat of the CS-2 vehicle. Shortly after, LITTLE was observed exiting the passenger side of the CS-2 vehicle and entering the driver side of his white SUV. CS-2 was surveilled back to the neutral meet location by investigators. At the neutral location, the CS handed over a clear plastic baggie containing a white powdery substance of suspected fentanyl and the Kel digital transmitter. CS-2 and CS-2's vehicle were then searched for contraband yielding negative results. The plastic baggie containing a white powdery substance field tested positive for fentanyl and weighed approximately 119.62 grams (gross weight). The evidence was submitted to the DEA Laboratory to for further analysis.

15. On October 15, 2024, at approximately 1:00 p.m., the DEA BRO initiated surveillance in the vicinity of 1077 North Avenue, Bridgeport. At this time, investigators observed LITTLE in the driver seat of his white SUV parked in front of 1077 North Ave. At approximately 1:15 p.m., investigators observed Little's white SUV depart the area. Mobile surveillance was maintained on the white SUV until it arrived and parked outside of a U.S. Post Office at 120 Middle Street, Bridgeport. At approximately 1:38 p.m., investigators observed LITTLE exit the driver's seat of the vehicle holding a white box. LITTLE was then observed at approximately 1:46 p.m., exiting the post office with a receipt in his hand. At approximately 2:00 p.m., LITTLE departed the area in the white SUV and mobile surveillance was maintained on LITTLE until he arrived at 1428 North Ave, Bridgeport. Investigators observed LITTLE drive to the rear of 1428 North Avenue. Surveillance was terminated shortly after. Toll analysis confirms LITTLE utilized the **TARGET TELEPHONE** multiple times before, during and after his transit to the post office.

16. Thereafter, DEA BRO Investigators and New Haven United States Postal Inspectors entered the U.S. Post Office located at 120 Middle Street, Bridgeport. Investigators identified a package a package with tracking number 9505511005534289518530 destined for "Patricia Banks", 66440 S. 22nd Street, Phoenix, Arizona. A U.S. Postal employee confirmed to investigators that this particular package, bearing 9505511005534289518530 was the white box that was dropped off by LITTLE. The package was also the only package in the facility outgoing to Phoenix, Arizona. As relevant here, CS-1 had provided information that LITTLE was not satisfied with the fentanyl he had received from his trip from Phoenix, Arizona and had shipped the fentanyl back to the supplier. Investigators with assistance from Westport Police Department K9, conducted a sniff of the package which positively alerted the K9 to the presence of narcotics. On October 17, 2024, Hon. S. Dave Vatti, U.S.M.J. issued a search warrant authorizing the search of the package. Investigators executed the search warrant and located inside the package two brick shaped objects of suspected fentanyl with a gross weight of approximately 1,525.66 grams. The powder was field tested and returned a presumptive positive for the presence of fentanyl. The evidence was submitted to the DEA Laboratory to for further analysis.

17. On October 22, 2024, investigators conducted physical surveillance in the vicinity of 1428 North Avenue, Bridgeport, CT. At approximately 12:29 p.m., investigators observed LITTLE operating the white SUV in front of 1077 North Avenue, Bridgeport, CT. LITTLE was observed exiting the vehicle and approaching a black motorcycle with no license plate. Shortly after, LITTLE got on the motorcycle and departed the area of 1077 North Ave, Bridgeport, CT, mobile surveillance was maintained on LITTLE until he arrived outside the M&T Bank located at 1728 Park Avenue, Bridgeport, CT. At approximately 1:09 p.m., investigators observed LITTLE exit the bank looking at two cellphones. LITTLE got on the motorcycle and departed the area.

Mobile surveillance was maintained on LITTLE until he arrived back at 1077 North Avenue, Bridgeport, CT. LITTLE exited the motorcycle and entered the driver's seat of the white SUV. LITTLE then departed the area in the white SUV. Mobile surveillance was maintained on the LITTLE until investigators observed him make a sharp quick turn onto Golden Hill Street at Main Street as LITTLE was in the middle of the intersection. This quick maneuver caused investigators to lose surveillance of the white SUV and surveillance was terminated. Based on my training and experience, I believe LITTLE was taking quick turns and switching vehicles to avoid mobile surveillance from law enforcement. Based on my training and experience, drug traffickers switch devices and vehicles often and randomly with the purpose of evading detection of their identify and whereabouts from law enforcement.

18. On October 29, 2024, the Honorable S. Dave Vatti, U.S.M.J. authorized a GPS warrant for the white GMC Yukon that LITTLE had been observed operating, as set forth above. On the same date, at approximately 4:19 p.m. investigators observed LITTLE, in the vicinity of 1428 North Ave in the rear parking lot of 1428 North Ave, Bridgeport, CT and enter into a different vehicle, specifically a maroon GMC Yukon that was parked in the rear parking lot. The maroon GMC Yukon was bearing CT Registration AW75667. A short time later, investigators observed the maroon GMC Yukon depart the area of 1428 North Ave. The vehicles LITTLE has been observed operating have miss use CT registrations and/or missing license plate. Based on my training and experience, I know that drug traffickers commonly due this in blatant attempt to elude law enforcement and hide their identities.

19. During the same week that Judge Vatti authorized the GPS warrant for the white GMC Yukon, CS-2 made a series of consensually monitored and recorded WhatsApp text messages to Jermaine LITTLE utilizing **TARGET TELEPHONE**, for the purpose of obtaining

100 grams of fentanyl. On October 30, 2024, immediately prior to the controlled purchase from LITTLE, investigators met with CS-2 at a pre-determined neutral location. At the neutral location, CS-2 and CS-2's vehicle were searched for contraband with negative results; CS-2 was then equipped with a Kel digital transmitter. Subsequently, investigators-initiated surveillance in the vicinity of 1077 North Ave, Bridgeport. Investigators observed both a maroon GMC Yukon and the white GMC Yukon previously operated by LITTLE on October 15, 2024, discussed above, in the parking lot in front of 1428 North Ave, Bridgeport, CT. At approximately 9:45 a.m., LITTLE was observed by investigators exiting 1077 North Avenue, Bridgeport, CT carrying a small box in his hand. LITTLE was observed moments earlier entering 1077 North Avenue, Bridgeport, CT with the small box in his hand. LITTLE began walking on Hurd Avenue and then entered into the maroon GMC Yukon and traveled to Beer Street near unit #138. LITTLE parked the vehicle and exited on foot. On foot, investigators observed LITTLE looking around hyper-vigilant of his surroundings. At approximately 9:50 a.m., the CS-2 departed the pre-determined neutral location with law enforcement. Physical surveillance of the CS-2 was conducted by investigators until the CS-2 traveled to the location agreed upon by LITTLE to conduct the controlled narcotics transaction. At approximately 9:59 a.m., investigators observed CS-2 arrive at the pre-determined meet location. Investigators observed LITTLE walk on foot from Fairmont Avenue to the direction of the CS-2 operating the **TARGET TELEPHONE**, as evidence by toll records showing contact between LITTLE and CS-2 occurring prior to, during and after the arranged narcotics transaction. At approximately 10:01 a.m., LITTLE arrived on foot and spoke with CS-2 at the driver side window of CS-2's vehicle. Investigators observed and the kel transmission recorded LITTLE and the CS-2 talking about the narcotics transaction, CS-2 was then observed handing over the funds for the purchase of fentanyl. LITTLE then began to walk away from CS-2's vehicle.

CS-2 immediately inquired where the narcotics were. LITTLE directed CS-2 to head toward the Chase Bank parking lot on the corner of Tom Thumb Street and Main Street. The CS traveled to Tom Thumb Street, which was as short distance from the pre-determined meet location. LITTLE's maroon GMC Yukon was viewed parked near this location. Investigators observed and the kel transmission recorded LITTLE giving CS-2 real time directions over the **TARGET TELEPHONE** to the box location that LITTLE had placed on the ground. CS-2 and WhatsApp toll records later confirmed to investigators that LITTLE was directing him to the white box location via the **TARGET TELEPHONE**. The box visually similar in appear, size and shape, to the white box viewed earlier by investigators who were approximately 10 feet or less away from LITTLE exiting 1077 North Ave, Bridgeport CT. CS-2 was directed by LITTLE via **TARGET TELEPHONE** directly to the box on the sidewalk near a white gate on Tom Thumb Street, located in the vicinity of LITTLE's maroon GMC Yukon SUV. After retrieving the package, CS-2 was surveilled back to the neutral meet location by investigators. At the neutral location, the CS handed over a white box containing two clear plastic baggies containing a white powdery substance of suspected fentanyl and the Kel digital transmitter. CS-2 and CS-2's vehicle were then searched for contraband yielding negative results. The plastic baggies containing a white powdery substance field tested positive for fentanyl and weighed approximately 160.18 grams (gross weight). The evidence was submitted to the DEA Laboratory to for further analysis.

20. Based on my training and experience, drug traffickers will often use multiple vehicles when conducting drug transactions to evade law enforcement. LITTLE has been seen driving a motorcycle along with two different GMC SUVs, both SUVs have misused plates, and the motorcycle has no plate visible. For this reason, utilizing vehicle GPS alone has proven insufficient in learning about LITTLE's movements to possible sources of narcotics supply, among

other locations. In addition, observations made by law enforcement and associated toll records readily suggest that LITTLE is using the **TARGET TELEPHONE** to communicate with others, including CS-2 regarding his drug trafficking activities and importantly, including while he is traveling to meetings for the purposes of selling narcotics, such as on October 10, 2024 and October 30, 2024, discussed above, and when transporting narcotics between locations, such as to the U.S. Post Office for mailing on October 15, 2024 as set forth above. Accordingly, the continued use of geolocation data on the **TARGET TELEPHONE** will provide investigators with important location information for LITTLE especially where physical surveillance methods have raised LITTLE's suspicions. At time of this writing, toll records from **TARGET TELEPHONE** continue to be active. At the direction of law enforcement CS-2 has made contact with LITTLE via the **TARGET TELEPHONE** since October 8th, 2024 to facilitate one sample of approximately 60 grams of fentanyl and a narcotics transaction of approximately 100 grams of fentanyl. During this time period, CS-2 has continued talks with LITTLE via **TARGET TELEPHONE** about future narcotics transactions and meetings. CS-2 has also been in contact with LITTLE on the **TARGET TELEPHONE** to discuss the possibility of future firearm transactions. Law Enforcement has screenshots of WhatsApp messages between CS-2 and LITTLE utilizing the **TARGET TELEPHONE** of these forementioned conversations.

### TECHNICAL INFORMATION FOR LOCATION INFORMATION

21. In my training and experience, I have learned that the Service Provider, AT&T Wireless, is a company that provides cellular telephone access to the general public. I also know that the provider of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including E-911 Phase II data, also known as GPS data or latitude-longitude data and cell-

site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the wireless provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

22. Based on my training and experience, I know that AT&T Wireless can collect E-911 Phase II data about the location of the **TARGET TELEPHONE** including by initiating a signal to determine the location of the **TARGET TELEPHONE** on AT&T Wireless's network or with such other reference points as may be reasonably available.

23. Based on my training and experience, I know that telephone companies, like AT&T also collects data about the speed with which signals travel between cellular telephones and cellular towers ("per call measurement data," or "PCMD"). For each cellular telephone accessing its network, providers such as T-Mobile use PCMD and other data calculate and record the estimated location of that cellular telephone. Provider AT&T refers to this information as NELOS (Network Event Location System). T-Mobile refers to the resulting location information as Timing Advanced Information, and/or Timing Advance Report Date ("True Call"). Provider Verizon Wireless refers to this information as RTT (Round-Trip Timing).

## AUTHORIZATION REQUEST

24.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

25.     I further request that the Court direct AT&T Wireless to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control. Because the warrant will be served on AT&T Wireless, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

26.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 90 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the **TARGET TELEPHONE** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

Respectfully submitted,

_____
ANDREW D. CHARPENTIER
SPECIAL AGENT
DRUG ENFORCEMENT ADMINISTRATION

Subscribed and sworn to before me on this 8th day of November, 2024 at Bridgeport, Connecticut.

_____
THE HONORABLE S. DAVE VATTI
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### PROPERTY TO BE SEARCHED

This warrant applies to records and information that is stored at premises controlled by AT&T Wireless, a service provider headquartered at AT&T Headquarters, 208 S. Akard Street, Suite 2954, Dallas, Texas 75202, concerning information about the location of the mobile phone assigned telephone number (203) 543-9123, accessed through International Mobile Subscriber Identity ("IMSI") 310150606246907, with Jermaine LITTLE subscriber information (hereinafter, "**TARGET TELEPHONE**").

## ATTACHMENT B

## Particular Things to be Seized

I. **Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of AT&T Wireless, including any information that has been deleted but is still available to AT&T Wireless or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), AT&T Wireless is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

   a. The following subscriber and historical information about the customers or subscribers associated with the **TARGET TELEPHONE** from September 4, 2024, to the date of this warrant, including:

   i. Names (including subscriber names, user names, and screen names);

   ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

   iii. Local and long distance telephone connection records;

   iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

   v. Length of service (including start date) and types of service utilized;

   vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

   vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

   viii. Means and source of payment for such service (including any credit card or bank account number) and billing records.

  ix. All records and other information (not including the content of communications) relating to wire and electronic communications sent or received by the **TARGET TELEPHONE** including:

    (1) The date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

    (2) Information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received), as well as Internet Protocol Data Report (IPDR) with cell site data.

b. Information associated with each communication to and from the **TARGET TELEPHONE** for a period of 30 days from the date of the warrant, including:

  i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

  ii. Source and destination telephone numbers;

  iii. Date, time, and duration of communication; and

  iv. All data about the cell towers (i.e., antenna towers covering specific geographic areas) and sectors (i.e., faces of the towers) to which the **TARGET TELEPHONE** will connect at the beginning and end of each communication.

c. Information about the location of the **TARGET TELEPHONE** for a period of 30 days, during all times of day and night. Information about the location of the **TARGET TELEPHONE** includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information.

  i. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Service Provider, the Service Provider is required to disclose the Location Information to the government. In addition, the Service Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the location of the **TARGET TELEPHONE** on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The

government shall compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

## II. Information to be Seized by the Government

All information described above in Section I that relates to violations of the following offenses: Title 21, United States Code, Section 841(a)(1) (possession with intent to distribute and distribution of controlled substances); Title 21, United States Code, Section 843(b) (the use of a communication facility in the commission of narcotics trafficking offenses), and Title 21, United States Code, Section 846 (conspiracy to commit narcotics trafficking offenses).

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by AT&T Wireless in order to locate the things particularly described in this Warrant.